## THE STATE v. BRENNAN, Appellant.

### Division Two, November 12, 1901.

1. **Jury: CHALLENGE TO ARRAY.**   The challenge to the array of jurors must be in writing.

2. ———: ———: **HOW PRESERVED FOR REVIEW.**   A challenge to the array is no part of the record proper, and can become a part thereof only by being inserted in the bill of exceptions.   The insertion in the bill filed with the clerk, of a call therefor, such as, "The clerk will here insert the defendant's challenge to the array of special jurors," does not require the clerk to insert the challenge in the transcript sent to the appellate court, and does not have the effect of making it a part of the bill of exceptions.   The statute (section 1866, R. S. 1899) in reference to motions for new trial, instructions, etc., does not embrace a challenge to the array.   Nor is such challenge preserved for review by a recital in the record proper that it was filed and overruled.   The challenge itself must be inserted in the bill, and that must show that an exception was saved when it was overruled.

3. ———: ———: **CONSTITUTIONAL RIGHT.**   A challenge of the array of jurors that "the panel was illegally and improperly selected," is a mere statement of a legal conclusion and not of the facts which would render such selection a violation of the statute or of defendant's constitutional rights to a trial by a jury of his peers.

4. **Juror: COMPETENCY: NEWSPAPER REPORTS.**   A juror stated he had formed an opinion of the guilt or innocence of defendant from newspaper reports only, and that "the burden would be on defendant to change his opinion," but further stated that all he knew of the case

State v. Brennan.

was gleaned from newspapers, and that he was entirely free to be governed by the evidence, and could render a fair and impartial verdict. *Held*, that he was a competent juror under the statute (section 2616, R. S. 1899).

5. **Confession of Co-Indictee: IDENTIFICATION.** The confession of guilt made by a co-indictee jointly indicted with the defendant on trial, not made in his presence, can not be offered in evidence against the defendant on trial, but may be identified by a witness for the State, so that it may be used in case the co-indictee is called as a witness for defendant.

6. **Confessions: RESPECTIVE DUTIES OF COURT AND JURY: INSTRUCTION.** It is the province of the court to determine the competency or admissibility of a confession made by defendant before admitting it in evidence. But if it is properly admitted, it is the province of the jury to determine the weight and credibility to be attached to such confession. And it is not error to refuse an instruction that indicates to the jury that they should not consider the confession until they are satisfied it was voluntarily made. And if such instruction is refused, and another given for the State clearly and fully covers the law of the case, no reversible error has been committed.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

AFFIRMED.

*Edward A. Noonan, John A. Porter* and *C. D. Jamison* for appellant.

(1) Everyone has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be governed by a different law from that which is applied in all similar cases, and which permits a private prosecution to come into court, demand a special jury in a criminal case, and deposit $75 for the payment thereof, is not legitimate or constitutional legislation, but is such an arbitrary mandate as is not within the province of free

governments.  Cooley Const. Lim., p. 483; Taylor v. Porter,
4 Hill 140, 40 Am. Dec. 274; White v. White, 5 Barb. 474;
Green v. Shumway, 39 N. Y. 426.   A special jury law applied
in criminal cases violates article 2, section 28, Constitution of
Missouri, and deprives a defendant of a trial by a jury of his
peers.  "The right of a trial by jury, as heretofore enjoyed,
shall remain inviolate," refers to trial by jury as it existed at
the time of adoption of Constitution of 1875.   136 Mo. 335;
133 Mo. 500.   The right of trial by jury, as it existed at
adoption of Constitution of 1875, is defined as follows: "That
in all criminal prosecutions the accused has the right to be heard
by himself, and his counsel; to demand the nature and cause of
accusation; to have compulsory process for witnesses in his
favor; to meet the witnesses against him, face to face; and, in
prosecutions on presentment or indictment, to a speedy trial by
an impartial jury of the vicinage; that the accused can not be
compelled to give evidence against himself, nor be deprived of
life, liberty or property, but by the judgment of his peers or the
law of the land."   Constitution 1865, art. 1, sec. 18; State v.
McClear, 11 Nev. 39.  This act is not directory, but delegates to
a jury commissioner judicial powers which the Constitution has
vested in the courts.   Constitution, art. 6; Cooley Const. Lim.,
p. 504; Akin v. Kipley, 41 L. R. A. 775; Miller v. Alexander,
122 N. C. 718; Tyroler v. Warden, 157 N. Y. 116.   This act
is unconstitutional for the reason that it violates the equality of
privileges and equal protection under the law, and is an act dis-
criminating against individuals.   Middleton v. Middleton, 36
L. R. A. 221; Cooley Const. Lim., (5 Ed.), 391; Kow v.
Nunan, 5 Saw. 552; Barnes v. People, 168 Ill. 424; State v.
Gardner, 41 L. R. A. 689.  This act is in violation of the pro-
visions of the Constitution against special or local laws being
passed by the legislature, for the reason that it grants to a pri-
vate prosecution a special right.   Constitution, art. 4, sec. 53;

People v. Petrea, 92 N. Y. 128; In re Henneberger, 155 N.
Y. 420; Henderson v. New York, 92 U. S. 259; Morgan v.
La. Board Health, 118 U. S. 455. (2) To be compelled to
select a jury from a panel of twenty-four, one or more of whom
stated on his *voir dire* that the burden of proof, to remove an
opinion that he had formed regarding the guilt or innocence of
the defendant on trial, would be on defendant, violated the right
of trial by jury, and impaired a substantial right of defendant
guaranteed him by the Constitution and statutes of the State.
State v. Foley, 144 Mo. 600; State v. Hunt, 141 Mo. 621;
State v. Taylor, 134 Mo. 109; State v. Culler, 82 Mo. 623;
People v. McQuade, 110 N. Y. 284; People v. Casey, 96 N.
Y. 115; R. S. 1899, sec. 2616. (3) It was fatal error for the
court to allow the State to prove that a defendant jointly in-
dicted with the defendant herein, and not then on trial, had
made an admission or confession of guilt, at a period long after
the commission of the alleged offense, and not in the presence
of the defendant. State v. Hickman, 47 Mo. 417; State v.
Duncan, 64 Mo. 262; State v. Melrose, 98 Mo. 594; State v.
Hildebrand, 105 Mo. 318; State v. Flanders, 119 Mo. 229;
State v. Minton, 116 Mo. 605. The defendant objected to
alleged admissions or confessions of a defendant jointly indicted
with the defendant then on trial going to the jury until the ad-
missibility of said admissions were determined by the court.
It was fatal error for the court to admit such testimony for the
reason that it did not appear that such admissions were volun-
tary; this question was left to the jury. This was an error, more
especially when the case was one creating public excitement,
and where there was a strong feeling in the community against
the accused. State ex rel. v. Smith, 150 Mo. 75; State v. Dun-
can, 64 Mo. 263; State v. McKenzie, 144 Mo. 40; State v.
Simon, 50 Mo. 370; State v. Hagan, 34 Mo. 192; State v.
Jones, 34 Mo. 478. Declarations or confessions of confeder-

ates against each other are only admissible as a part of the *res gestae* and unless they accompany acts done in the prosecution of the common object they are inadmissible.   When that object is at an end, whether by accomplishment or by abandonment, no one of the confederates is permitted by any subsequent act or declaration to affect the others.   State v. Ross, 29 Mo. 32; State v. Chaigk, 92 Mo. 395; State v. Duncan, 64 Mo. 263; State v. Barham, 82 Mo. 67; State v. Fredericks, 85 Mo. 145; State v. Reed, 85 Mo. 195; State v. McGraw, 87 Mo. 161. (4) The court committed fatal error in refusing instruction numbered one asked for by the defendant.   The defendant was convicted on an alleged confession made by himself while he was in the custody of the officers of the law, and the jury should have been cautioned that they must find and believe from the evidence adduced in the case that such confession was voluntarily made; that is to say, that it was made without defendant being influenced thereto by threats, promises or by hope of leniency for so doing, before considering such confession against him.   This matter of defendant's alleged confession was a substantial issue in the case, and it was the duty of the court to instruct thereon, without request on the part of the defendant, and the refusal and neglect to so instruct was in violation of section 2639, Revised Statutes 1899.   State v. Matthews, 20 Mo. 55; State v. Sharpe, 106 Mo. 106; State v. Patrick, 107 Mo. 147; State v. Nelson, 118 Mo. 124; State v. Taylor, 118 Mo. 153; SHERWOOD, J., dissenting, in case of State v. Brooks, alias Maxwell, 92 Mo. 542.   (5) The court allowed the State to prove that a defendant, not on trial, had made a confession of guilt.   It was fatal error for the court to neglect to give a cautioning instruction on this alleged confession of Northway. State v. Jones, 64 Mo. 391; State v. Banks, 73 Mo. 593; State v. Walker, 98 Mo. 95; State v. Jackson, 106 Mo. 174; State v. Woolward, 111 Mo. 228; State v. Minor, 117 Mo. 302;

State v. Nelson, 118 Mo. 124; State v. Taylor, 118 Mo. 153; State v. Rufus, 149 Mo. 406. The defendant in this case was an important witness, and his testimony regarding the facts in issue was entitled to consideration by the court and jury. Yet the court failed to instruct the jury that defendant was a competent witness in his own behalf. State v. Jones, 61 Mo. 232; State v. Branstetter, 65 Mo. 149; State v. Bank, 73 Mo. 592; State v. Anderson, 86 Mo. 310; State v. Palmer, 88 Mo. 568; State v. Talmage, 107 Mo. 543; State v. Wood, 137 Mo. 6; State v. Frazier, 137 Mo. 341; State v. Heinze, 66 Mo. App. 135.

*Edward C. Crow,* Attorney-General, for the State, with whom are *C. O. Bishop* and *Morton Jourdan.*

(1) The offense charged in the indictment, and by the evidence shown to have been committed, was covered by and is a violation of section 1953, Revised Statutes 1899, which makes it a crime to obstruct any railroad, and the term railroad is broad enough to and does include the cable and electric railroads operated by the St. Louis Transit Company. In a case on all fours with the one at bar, the Supreme Court of California affirmed the judgment of conviction of the trial court, where a defendant had been convicted under a statute similar to ours, of the crime of obstructing a railroad, the railroad being a street railroad in the city of San Francisco. People v. Stites, 75 Cal. 570; Price v. Georgia, 74 Ga. 378; Com. v. McCaulley, 2 Dist. Rep. (Pa.) 62; Kentucky Imp. Co. v. Slack, 100 U. S. 648; Railroad v. Jacobs, 2 So. Rep. 320. In this State the following sections of the Revised Statutes 1899, have been by trial and Supreme Court, although general in their language, held to apply to street railroads: Section 1832, defective machinery; sections 1868, 1867, drunkenness; sec-

tions 2864, 2865 and 2866, amount of damages; sections 2873, 2874 and 2875, fellow servants; section 1074, ejection of passengers; section 4239, mechanics' liens. In State v. Kiety, 28 Minn. 421, it was held that the obstruction need not be actual. In Clifton v. State, 73 Ala., it was held that the intending of injury was not necessary. In Duncan v. State, 10 So. Rep. 815, the burning of a bridge was held to be an obstruction within the meaning of the statute. (2) The defendant will not be heard to complain of the action of the trial court in granting the State a special jury, and in the overruling of his challenge to the array for the reason: First, that the challenge to the array is not preserved in the bill of exceptions. State v. Hancock, 148 Mo. 488; second, that no exceptions are saved to the action of the court in overruling and denying same. The State and the defendant were clearly entitled to a special venire upon application. Sec. 3791, R. S. 1899. The State could only operate through its representatives, and the defendant will not be heard to complain that the circuit court required the State to deposit the usual fee of $75, and that the deposit with the clerk was made by special counsel in the case. The testimony on the part of the State showed, as did the confession itself, that the confession was voluntarily made, without either promise, agreement, or hope of leniency or reward. After the testimony on the part of the State, and when the defendant objected to its introduction, the court inquired of the defendant whether he wanted to introduce any testimony as to the manner in which the confession was obtained. To this inquiry the defendant promptly answered in the negative; and that they would stand on the testimony then before the court. Upon that testimony the court properly admitted the confession.

GANTT, J.—At the October term, 1900, of the St. Louis City Circuit Court, the defendant was indicted for willfully and

maliciously tearing up and removing a portion of the track of the St. Louis Transit Company, a railroad corporation, organized under the laws of this State and owning and operating a track and cars thereon known as the Olive street line in said city.

The indictment is drawn to state a crime under section 1953, Revised Statutes 1899. It charges every fact essential to the perpetration of the offense denounced by the statute, and is sufficient.    [State v. Johns, 124 Mo. 379.]

The defendant was duly arraigned and pleaded not guilty.

The cause was docketed for trial on November 20, 1900. On the thirteenth day of November, 1900, the State made its application for a special jury, which was granted, and such venire ordered summoned to appear November 20, 1900, on which last-mentioned day the defendant, in open court and by his counsel, challenged the array because illegally and improperly selected.    The court overruled the challenge, and thereupon the jury was selected to try the cause.    The trial proceeded and on the twenty-second day of November, 1900, the jury returned a verdict of guilty and assessed defendant's punishment at ten years in the penitentiary.    In due time defendant lodged his motions for new trial and in arrest, which were heard and overruled, and sentence pronounced.    From that judgment he appeals to this court.

The main facts developed on the trial may be summarized in a short space.

Prior to and on the eleventh of August, 1900, the St. Louis Transit Company was a street railroad corporation organized under the laws of this State, and as such was operating, for the transportation of passengers, a cable street railroad along and upon Maryland avenue between Euclid avenue and Taylor avenue, known as the Olive street line.    On the eleventh of August, 1900, and for some time prior thereto, a strike existed

among the employees of said railroad and a majority of them had quit work. The evidence tended to prove that on the evening of the eleventh of August, Morris Brennan, the defendant, James Schwartz and Fred Northway met at the residence of defendant, and secured a large quantity of explosives, commonly called dynamite, and then and there agreed to go out and blow up and destroy certain portions of the aforesaid Transit Company's tracks, for the purpose of rendering the same impassable and prevent travel thereon. They secured a minnow bucket, and a revolver, and placing the explosives in the bucket started out to the western end of the Olive street line to blow it up. They proceeded to a point on said railroad on Maryland avenue between Euclid and Taylor avenues, and awaited there until a car had gone west, knowing it must be switched at King's Highway, two blocks west, and then return east. It appears that one of the three sat upon the side of the street holding the revolver while another lifted the top over a manhole which extended under the tracks, and placed in this hole a charge of explosive with a fuse attached, and lighted it. They then left this point and went east on Maryland avenue to Taylor avenue and thence north. When they had reached a place some two blocks distant the dynamite exploded. Almost immediately after the explosion they were halted by a private watchman, who questioned them as to where they had been, to which they replied they had been to Creve Coeur Lake fishing. While this colloquy was going on, two citizens, Messrs. Lackland and McCluney, came up, and at Lackland's suggestion they were searched. An empty revolver was found on Northway, and the empty minnow bucket was found to be dry. When asked what the explosion was, defendant answered, "Evidently a gas stove." They were then allowed to go.

Returning to the scene of the explosion, the testimony

shows that a cable car on the Olive street line was coming east from King's Highway, and that when eight or ten feet from the place where the dynamite had been placed, the motorman in charge and on the front end, saw smoke arising from the slot; that he knew that it was impossible for him to stop; that he tightened the grip, and attempted to pass over before the explosion occurred. The train consisted of a grip car and a trailer. After the trailer had passed about eight feet from the place where the smoke was seen, the explosion occurred. So violent was it that it blew the window lights out of the train; it blew the motorman, who was then thirty or forty feet away, out of the car and into the street; it destroyed the track, blew out the concrete conduit and roadway, blew off the pulleys and rollers and closed the slot through which the grip ran, all of which constituted portions of the railroad and the works thereof, and rendered it impossible to pass a train over that track. Another car coming east was stopped and could not proceed.

The testimony further shows that a hole was blown in the concrete and pavement of the street from three to four feet square; that at the time of this explosion, the conductor, motorman and a passenger were on this train. It is clearly shown from the testimony that as a result of this explosion it was impossible for the car or train, next to come along said track, to pass.

The officers of the Transit Company had been warned that an explosion was to occur somewhere on the west end of the Olive street division. In this particular case the superintendent, Mr. Davidson, had been told by Richard Eaton, and at the moment of the explosion he and Eaton were riding in Davidson's buggy west on Sarah street, four blocks east and two blocks north of where the explosion occurred, going as fast as they could along the line of the Olive street division for the pur-

pose of stopping the explosion if possible and of capturing the persons engaged therein. Eaton was in the buggy with Davidson, four blocks east and two blocks north of where the explosion occurred, at the moment when the report was heard.

Chief Campbell and other officers of the police department arrived a few minutes after the explosion, they having been also notified. With the information given them by private watchman Higgins, who knew one of the defendants, and with the information gathered from the reading of the union card held by one of them, all three of the defendants were located and arrested that night. When Brennan, the appellant, was arrested his house was searched by Assistant Chief Pickel, Dr. Brokaw and others, and a large quantity of dynamite was found secreted in a closet, and a large quantity of fuse secreted in the basement.

After being taken to the police station and locked up, the defendant Brennan made a confession to Chiefs Campbell and Pickel and others of the police force, in the presence of a number of newspaper correspondents, which confession was taken in shorthand by the official stenographer of the police department, R. T. Shaw, by him transcribed upon the typewriter, and in the presence of these officers and newspaper reporters, read over to the defendant, and each page of the confession was by the defendant signed. This confession is here set out in full, and is as follows:

### STATEMENT OF MORRIS BRENNAN.

August 12, 1900.

Chief Desmond: What is your name? A. Morris Brennan.

Q. Where do you live? A. 3728 Lucky street.

Vol 164 mo—32

Q. How long have you lived there? A. About seven months.

Q. What do you do for a living now? A. I follow electrical work, repairing bells and incandescent lights.

Q. For whom? A. I have cards printed for myself to make a living during the strike.

Q. You were formerly employed by what road? A. I used to work on the old Union Depot road before the Transit Company consolidated, and then for the Transit Company.

Q. Where? A. First on California line.

Q. Then where? A. Then at the Easton avenue sheds.

Q. Are you married? A. Yes, sir.

Q. A family? A. No children.

Q. Tell where you were last night from six o'clock to the time of your arrest? A. At six, as near as I can judge, I was eating supper at 3728 Lucky street; then I went out on the steps till about seven or a little after, make it 7:30. Then I went over to Whalen's hall. While there I got in conversation with Northway, Schwartz and Jim Fennessey.

Q. Where does Fennessey live? A. On Spring and Cozens. And a stranger, I don't know his name. We sat around there until maybe a quarter after eight, as near as I can judge.

Q. What was the conversation while sitting there? A. We were talking about the new franchise, that was the topic of the conversation. The crowd split up, and myself and Fred Northway, Jim Schwartz and this Dick got into conversation about this Jefferson avenue line, and about how things were going on down there. Schwartz said, "I made an appointment to meet a fellow here at eight o'clock; he ought to be here in a few minutes; 'cause he is to be here at eight, but he has to walk from near the sheds, Jefferson avenue and Lasalle street up here." We waited there finally, and along comes this Dick.

I don't remember his last name. We went over to my house at 3728 Lucky. Schwartz said to Northway, "Northway, I promised this fellow some dynamite six weeks ago, but I was unable to get it for him, and as we have lots now, give him four or five sticks for trial and see if he knows how to use it, 'cause there ain't no use wasting it." Northway asked me where the dynamite was. I told him there was ten sticks in that little wooden box, that was all in my house at the time. Northway wrapped up five sticks and gave this Dick some fuses and a cap. Northway, said, "Five might not be enough, you had better take a package." Schwartz said for me to go get a can of beer. I had trouble finding the bucket. My niece borrowed a bucket, and I went after the beer to the "Wedge" on Easton avenue. When I came back, Northway had that big package of dynamite.

Q. Who was in the house then? A. Ourselves.

Q. Who? A. Myself, Northway, Schwartz, Dick and Jim Fennessey. Well, when Dick saw the big box he said I had better not take this to-night. I had better not take too much, 'cause it would be only wasting it. Northway said: "Never mind taking the box, then, we will leave it here." I took the box off the table and put it in the pantry, where I gave it to the officer last night. Dick sent for another can of beer. My little niece went for the can of beer, and we got into conversation about the cars. This Dick said it was a very easy thing to work on Jefferson avenue, 'cause there was no brushes except on every other car. Either that, or Chouteau avenue, something had to be done there. Northway said: "Why not take more?" Dick said: "I have been arrested for cutting wires already," and he said, I think, he was under bond then, and he had not better carry too much stuff with him. Dick started out by himself and Schwartz went to the door with him. Schwartz came back again into the kitchen, and we got to talk-

ing about Olive street. Schwartz asked me where it would be best to work on Olive street. I said I didn't know much about Olive street. He said: "If we can get a curve somewhere it will be all right." He said: "Let's go to Boyle and Olive; it's a long walk, but we'll get there sometime." Northway had a bomb already fixed up.

Q. Where did he fix it? A. I don't know.

Q. Where did he get it. A. It was made out of dynamite. He had it himself.

Q. Where did he get it? A. He said he got fifty pounds south of the Workhouse.

Q. Where did he get this bomb he had last night? A. Made it in my house. He went to work and got, I forget how many sticks it was, and put them all together, then he wrapped them up and tied them, then he took a pencil and put the caps in the dynamite and closed then in, and wrapped the fuse outside the dynamite and tied some string around it. He had three fuses together that way (indicating). Schwartz said, "I will see Dick in the meantime, and if he comes back I will show him how to fix it." Northway borrowed a minnow bucket from a man on Spring and Easton avenue, Williams, and brought it to the house and took the inside out and put dynamite in the bucket. We went out the front way. My wife said: "Where are you going?" Myself or Northway said, "We are going fishing." There was some fellow there said: "What's wrong for me to go along, too?" I don't remember whether it was I said, "Some other time," or Schwartz or Northway, one of us said, "Some other time." When we started there was myself, Schwartz, Northway and Fennessey. Northway said, "You go get Jack's gun." I didn't know who this Jack was at first, I thought it was maybe Northway's brother. He said no, Jack Whalen. We went up Lucky street, and Fennessey went over Spring and got Jack Whalen, the saloon-keeper's gun, and met

us at Dalton's saloon. We walked south on grand avenue, and it was either one or two blocks north of Olive street that we turned west on Delmar or Washington, I don't know which. We walked on out then until we got past Sarah street about one block, and then crossed and went up Olive to Boyle avenue. There was a watchman there with a uniform on and a light. We kept walking until we got across the other curve across Euclid avenue. I believe we turned back then, anyway, we turned back and set upon a bank there, Schwartz, myself and Northway. We left Fennessey at Dalton's saloon. There was two cars coming. There was one going east and one going west, there where the explosion was. We were sitting on the bank, and after the cars passed, Schwartz stepped out and had a hook and pulled off the cover. The minnow bucket was sitting between me and Northway, and Northway was reaching in his pocket for his gun. He handed me the gun and said: "Take care of this and me." I took the gun and Northway took the package of dynamite out and walked over to the manhole. He struck a match, and it seemed to burn through before the fuse caught. He dropped it and said it is all right. I started after Northway with the empty bucket. He said, "You had better give me that gun, 'cause no man will take me with a gun." He said, "What makes you so nervous? I would not have let you come along if I had known that." I gave him the gun, and we went along until we met Schwartz, who was ahead of us. We walked one block north and turned over one block east, and went north again and met a watchman and a crowd of several citizens along there. The watchman stopped us, and said, "What's the matter? Where was the explosion at?" I said, "I guess a gas stove on Olive street." He said, "Hell of a noise for a gas stove. Where have you been?" "To Creve Coeur Lake, fishing." Then he searched Northway and saw the lines and the gun. The gun was empty, for Northway flipped the shells out of the gun when he seen the crowd coming. He said,

State v. Brennan.

"I know you." Yes, I used to board at Healey's. He said, "I guess it is all right, boys; go on, now. After this don't create so much excitement; you may get into trouble." We walked over to Sarah street and took the car north. When I got to where they turn to go down town I got off the car. Schwartz said, "We will go round to Grand avenue." I stayed there about ten minutes, and then walked home. I walked along Sarah to Page avenue, and then I turned east until I got to Spring avenue, and then right over Spring, and just as I got past Spring, at the corner of Cook avenue and Spring, I met Schwartz, and said to him, "Did they do anything about that?" He said, "I don't know anything about it."

Q. Anything about what? A. About the explosion. He said, "No, he hadn't heard a thing." We bid one another good night and I went home. I had been in about a half hour before the officers came. I had gotten up to give my wife something. I went back again and they came.

Q. Were you drinking or sober? A. To tell the truth, we had four cans of beer. I wasn't perfectly drunk.

Q. Is that the truth about everything? A. Yes, sir.

Q. This statement is free and voluntary on your part? A. Yes, sir.

Q. No promise made by any of the police department? A. No, sir.

Q. You are not compelled to make it? A. No, sir.

Q. You are telling this of your own free will? A. Yes, sir.

(Signed.)     M. Brennan, 3728 Lucky, street, City.
John W. Campbell, Chief of Police.
Roscoe T. Shaw.
Wm. T. Dowdall, Segt. 8th Police Dist.
S. J. Kilcullen, Globe-Democrat.
Chas. M. Seawell, Republic.
Wm. Desmond, Chief of Detectives.

A number of witnesses were called to establish that this statement was voluntarily made, without any promise of immunity having been made to the defendant and that it was not extorted by threats of any kind or undue persuasion.

This defendant testified in his own behalf and denied all complicity in the crime, and testified that the statement hereinbefore set out was obtained from him by the promise that he would be discharged if he would make a statement which would exonerate the Transit Company. This immunity was promised, he said, by a smooth-faced police officer, and he thought it was Mr. Smith, the assistant chief. He denied ever making the statements to which his name was attached, and said he did not understand the paper contained the admissions by him that are contained in the said paper. He offered evidence of previous good character. He denied being present when the dynamite was placed under the tracks. He admitted that dynamite was found in his house the night he was arrested, but said that Richard Eaton brought it and requested to leave it, that Eaton displayed his union card and he permitted him to leave the basket containing the dynamite, and came back that night and got a portion of it and prepared to blow up the road. Outside of the written confession there were various other damaging statements of defendant to the different newspaper reporters, put in evidence. There was evidence tending to establish an alibi for defendant.

The court instructed the jury on the elements of the offense charged in the indictment, defined "willfully," and "maliciously," the credibility of witnesses, the presumption of innocence and reasonable doubt, alibi, good character, and the weight to be attached to statements of the defendant in relation to the offense charged since its commission, all of which have been so often approved, that it is deemed unnecessary to reproduce them. The court did not instruct the jury that defendant was

a competent witness in his own behalf.

I. The prisoner by his counsel assigns as error that he was tried by a special jury, illegally selected, and thereby his constitutional right of a trial by a jury of his peers was denied him.

On the part of the State it was insisted that this point should have been raised by a challenge to the array or exception to the whole panel, which the common law required to be in writing, and that that rule has not been abrogated by our statutes, and inasmuch as the said challenge is not preserved in the bill of exceptions and no exceptions saved to the denying of the same, it is not before us for review.

When confronted with this proposition on the hearing in this court, counsel for defendant insisted the point had been properly saved and prayed an order under the statute to have the original bill of exceptions sent to this court. This was granted, and the original bill is before us, and we find the following recital: "Defendant files his challenge to the array of special jurors in the cause summoned, on the ground that the panel of special jurors was illegally and improperly selected, which challenge was by the court overruled, to which ruling of the court the defendant then and there excepted.

"The clerk will here insert defendant's challenge to the array of special jurors."

The said challenge was not inserted by the clerk in the bill of exceptions in obedience to the call therefor.

That the challenge to the array must be in writing as at common law, is the settled law of this State. [State v. Clark, 121 Mo. loc. cit. 513; State v. Taylor, 134 Mo. loc. cit. 143, and cases cited.]

This challenge, if in writing, is no part of the record proper in the case, and could only have become a part thereof by being inserted in the bill of exceptions, which we have seen

was not done.   Prior to 1885, under the well-settled practice of this court, both in civil and criminal cases, not even the motion for new trial or in arrest of judgment or the instructions could be considered as a part of the bill of exceptions unless incorporated therein, and a mere call therefor was not sufficient, but by the act of March 31, 1885, section 3776, Revised Statutes 1879, was amended so as to obviate the necessity of copying the motions for new trial and in arrest and the instructions in the bill of exceptions, "provided the bill of exceptions so filed contains a direction to the clerk to copy the same, and the same are copied into the record sent up to the appellate court."   In State v. Griffin, 98 Mo. 672, it was ruled this amendatory act did not embrace applications for a continuance, nor evidence, and a mere reference to these was not sufficient.

With this construction of the statute and practice, the statute has been twice revised, to-wit, in 1889, and 1899, and the law remains unchanged to-day.   [Section 1866, R. S. 1899.]

It must be ruled that the call for the challenge to the array did not require the clerk to insert it in the bill of exceptions, and did not have the effect of making it a part thereof, and it must be held that the challenge and the exceptions to its denial are not, under this state of the record, reviewable by us.

Lest counsel for defendant may conceive we are ignorant of the record, we may further state that it is true that the clerk, without authority, has incorporated what we presume to be the challenge in question in the record proper, in these words, and without introduction:

State of Missouri,
              vs.
Morris Brennan, James Schwartz and Fred Northway.

In the Circuit Court of the City of St. Louis, Div. No. 8.

CHALLENGE TO THE ARRAY.

Now comes Morton Jourdan who prosecutes the pleas of the State in this behalf, and the defendants, Morris Brennan, James Schwartz and Fred Northway, come in person and by attorney, and the jurors of the jury summoned to try the said issue being called, come also, and the said defendants challenge the array of said panel because they say that the said panel was illegally and improperly selected.

NOONAN & PORTER,
Attorneys for defendant M. Brennan.

It appears by the entry of record on the twentieth of November, 1900, that this challenge was overruled, but no exception was saved to the order overruling it, nor could it have been lawfully taken on the record proper.

So that notwithstanding the clerk has, without authority, copied into the record matter which had no place there, it has not thereby become a part of the record in a legal sense. This has been the uniform ruling of this court since United States v. Gamble, 10 Mo. 457. [Christy v. Myers, 21 Mo. 112; State v. Wall, 15 Mo. 208; State ex rel. v. Sanford, 127 Mo. 368; State v. Burks, 132 Mo. 363; State v. Fraker, 137 Mo. 258.]

It follows that this copy of the challenge did not become a part of the record proper by the unauthorized act of the clerk.

But if we could look at it, it states no more than the recital made in the bill of exceptions, to-wit, that "the said panel was illegally and improperly selected," which amounted to a statement of a legal conclusion and not of the facts which would render the action of the court in directing a special venire a violation of the statute or in defiance of the Constitution.

This point has not been properly saved for review in this court.

State v. Brennan.

II.   The defendant complains of the refusal to sustain his challenge to the juror, James F. Ballard, upon his *voir dire* examination.   This juror stated he had formed an opinion as to the guilt or innocence of defendant from newspaper reports only; that he still retained that opinion at the time of his examination, because he had heard nothing to change it.   He was then asked, "If the burden would be on the defendant to change his opinion," and he answered, "Yes."   At this juncture defendant's counsel said, "We challenge the juror, your honor."

But the court proceeded with the examination of the juror from which it appears that all he knew of the case was gleaned from newspaper reports and he was entirely free to be governed by the evidence and could render a fair and impartial verdict.

The juror was competent.   He came clearly within the provision of section, 2616, Revised Statutes 1899, which provides that, "If it appear that such opinion is founded only on rumor and newspaper reports and not such as to prejudice the mind of the juror, he may be sworn."

There is an obvious distinction between an opinion or impression gained from a general newspaper report such as in this case, and one formed by hearing the sworn evidence in court, or by talking with the witnesses who speak of their own knowledge, as in State v. Foley, 144 Mo. 600.

III.   When the witness Davidson was on the stand it was developed that he was the superintendent of the division of the Transit Company's road on which the track was blown up on the eleventh of August, and that he had been advised that night that this effort to obstruct the road would be made by defendant and others, and was driving in the direction of the explosion when it occurred.   On cross-examination defendant sought to obtain from this witness the name of the informer, but upon objection by the State the court refused to require the witness to tell who his informant was, and an exception

was saved and is urged on this appeal.

We deem it useless to go into a discussion of the right of defendant to elicit this fact for the simple reason that Davidson, the superintendent, was subsequently recalled and the counsel for defendant on this same line inquired of him: "Is Richard Eaton the man you got this information from ?" and the witness answered, "Yes, sir." If error had up to that time been committed in excluding the information sought by defendant on this point, it was amply cured by thus permitting it later on in the same trial.

IV. Proceeding in the order of defendant's brief, we come to the consideration of his point that error was committed against him by allowing the State to prove that a defendant jointly indicted with him had, subsequent to the commission of the offense, made an admission or confession of guilt and not in the presence of this defendant. To this contention counsel for the State reply that the confession of Northway, to which defendant alludes, was not offered in evidence, and was not read to the jury, but was simply identified, so that the State could use it if Northway should be called by defendant as a witness. The right in this controversy must be determined by the record.

William Desmond, chief of detectives, was called by the State. After identifying the confession of defendant which was admitted in evidence, counsel for the State propounded the following questions, and objections were made as follows:

"Q. I now hand you what purports to be a statement of F. E. Northway (said Northway being a co-defendant in the indictment on which defendant was being tried) marked 'Exhibit A,' and ask you if you recognize that paper (handing witness the paper) ?

"Mr. Porter, of counsel for defendant: Defendant offers an objection to it being in this case for the reason—

"The Court: He is simply identifying it.

"Mr. Jourdan, counsel for the State: That's all, I simply want to direct his attention to it.

"Q. Was that paper—those questions and answers which had been signed by Northway, read over to the defendant, Brennan? A. Yes, sir.

"Q. What did he say at that time with reference to the falsity or truthfulness of those statements?

"Objected to as irrelevant, incompetent and immaterial. Objection overruled. Defendant then and there excepts to the ruling of the court.

"A. He said it was correct with the exception where Northway stated that he had lit the dynamite, or fuse rather, Northway placed in the conduit.

"Mr. Porter: We object to that.

"The Court: I understand he stated what the defendant said at this time.

"Mr. Porter: Very well, Your Honor.

"Mr. Jourdan: What did he say? Now you are talking about Brennan? A. Yes, sir. Brennan stated that Northway's statement was correct with the exception about placing the dynamite in the conduit and lighting it. He (Brennan) said he did not do that. He said he was on the bank while Northway placed the dynamite in the hole and lit it."

Defendant invokes the long-settled rule that the admission or confession of one jointly indicted with defendant, made after the commission of the alleged offense, and not in the presence of defendant, can not be received against the defendant on trial. [State v. Melrose, 98 Mo. 594; State v. Hilderbrand, 105 Mo. 318; State v. Minton, 116 Mo. 605.]

No doubt can exist that this is a correct statement of the law. The only question is its applicability to the facts above

detailed. The statement of Northway was not offered in evidence, nor read to the jury. The paper was merely identified. The statement of the witness as to the statement of defendant himself was not objected to. As the alleged admission of Northway was not admitted, this point must also be ruled against defendant.

V. There is no merit in the exception saved to the evidence as to the explosion of the dynamite at the quarry. It was not essential that each witness should testify to every circumstance connected with the test of the dynamite found in defendant's house. It is true that Teichmann and Dettmer could not identify the dynamite which they tested, and their evidence amounted to nothing, but after it was shown that Desmond turned over a part of the dynamite found in defendant's house by Pickell and Dr. Brokaw, to Cameron, and the latter took it to the quarry, no objection could be urged to other witnesses testifying to the explosion about that time in connection with the other evidence.

VI. The refusal of the following instruction asked by defendant, is urged as a ground for reversal of the judgment:

"The court instructs the jury that if they believe from the evidence that the defendant, Brennan, made a confession of guilt in this cause, and that such confession was made or signed by him while he was in custody of the officers of the law on such charge, before the jury should consider such confession as evidence against him they must believe and be satisfied from the evidence adduced in the case that such confession was voluntarily made, that is to say, that it was made without the defendant being influenced thereto by threats, promises or by hope of leniency for so doing."

The admissibility and competency of evidence is one thing, its credibility is another. It is the province of the court to determine in the first instance the competency of the evi-

dence offered, but it is the function of the jury under our Constitution and laws, to pass finally upon its weight and credibility.   The doctrine is clearly stated in State v. Hopkirk, 84 Mo. loc. cit. 284, by this court through SHERWOOD, J.:  "The preliminary question of the admissibility of confessions, is one which belongs alone to the trial courts, and unless it is made plain that error manifest has been committed in this regard, in deciding the question of fact as to whether those confessions were made in circumstances which forbid their being received in evidence and going to the jury, the admission of such confession can not be held reversible error by this court."   [State v. Patterson, 73 Mo. 695.]

In State v. Brooks, 92 Mo. loc. cit. 577, this court said in regard to the confession obtained in that case:  "While the officers whose duty it was to prosecute criminal offenses, may, in their anxiety to ferret out the circumstances concerning the death of Preller, have overstepped the bounds of propriety in the course pursued by them, which is not to be commended, but condemned, it affords no legal reason for rejecting the evidence and not letting it go to the jury whose peculiar province it was to pass upon the credibility of the witness who detailed the confession, and gave it such weight as, under the circumstances, they believed it entitled to.   It was for the court to say what evidence should be received, and for the jury to say what weight it should have when received.

We entertain no doubt whatever that our learned brother on the circuit pursued the proper course in making a preliminary examination into the circumstances under which the confessions in this case were made before permitting them to go to the jury, and we think he properly admitted them, but we do not think this deprived the defendant of his right to have the jury pass upon the weight of that testimony in the light of all the circumstances and the evidence of defendant

himself and determine therefrom the weight they would attach to the alleged confession. The instruction was most unhappily worded in so far as it indicated to the jury that they would not consider the confessions until they became satisfied that they were voluntarily made; the court having judicially determined that the confession was admissible, the jury were not authorized to exclude it, but after it was in evidence the defendant had the right to have the jury told that they might consider the circumstances under which the confession was obtained in the exercise of their exclusive prerogative of determining the credibility of the evidence in making up their verdict. Such we understand to be the effect of the decisions of this court already adverted to, and such is the settled law in a number of our sister states. [Redd v. The State, 69 Ala. 255; Burton v. State, 107 Ala. 108.] But there was no error in refusing this instruction because the court in its fifth instruction expressly covered the proposition for which counsel was contending. That instruction is as follows:

"Fifth. If you find from the evidence that the defendant made any statement or statements in relation to the offense charged in the indictment, after such offense is alleged to have been committed, you must consider such statement or statements altogether. What the defendant said against himself, if anything, the law presumes to be true, because said against himself. What he said for himself, you are not bound to believe because said in a statement or statements proved by the State, but you may believe it or disbelieve it, as it is shown to be true or false by the evidence in the case. *It is for you to consider, under all the circumstances from the evidence, how much of the whole statement or statements of the defendant proved by the State is worthy of belief.*"

We have uniformly ruled that where the court has properly instructed the jury it is not error to refuse other instruc-

tions, even though they state correct principles of law, and we have often deprecated the multiplying of instructions.

We find no reversible error in this record, and the judgment must be and is affirmed.    All concur.