## THE STATE v. CHURCH, Appellant.

### Division Two, December 4, 1906.

1. **SPECIAL JUDGE: Presence at Time of Selection: Prejudice.** The regular judge being disqualified, it is no abuse of judicial discretion that the judge called in to try the case was in the court house at the time he was called to try the case, or that the case was set for immediate trial, or that the special judge at once took the bench and called the case for trial. Nor is it seen how defendant's interests were prejudiced thereby.

2. **INSANITY INQUIRY: Before and After Indictment.** Under the practice in this State, if the accused is insane at the time of the commission of the offense with which he is charged, the question of his insanity is tried by the jury charged with the trial of the indictment, and if his insanity is proven in this way it is available as a defense. But if defendant became insane after he was indicted and before his trial for the offense charged, and the court having cognizance of the case should have reason to believe that he has so become insane, it is the duty of the court to suspend all further proceedings against him under the indictment and to order a jury to be summoned to try and decide the question of insanity. And by these methods the rights of an accused are as fully protected as they were at common law.

3. ———: ———: **Motion Denied and Renewed.** Where defendant by counsel has filed a motion charging that he has become insane since the filing of the information and praying for a jury to decide the question as provided by statute, it is the province of the court, after hearing evidence which completely negatives the assertion that defendant has become insane since the information was filed, to overrule the motion. And if thereafter he files another motion setting up the same ground except omitting all reference to the statute, that motion should also be overrruled.

4. **PRESENCE OF DEFENDANT IN COURT.** Where the record shows that defendant was present in court at the time of his arraignment, the presumption will be indulged, nothing affirmatively appearing in the record to the contrary, that he was present when the motion for a special jury to determine his insanity was denied, and also when the twelve jurors were called and sworn to try the cause, and throughout the trial.

5. **JURORS: Forming Opinion: Reading Confession.** Notwithstanding the forty members of the panel have read in the newspapers the confession of the defendant, which forms a large part of the State's case, yet if each of them who have therefrom formed an opinion of defendant's guilt further answer that, notwithstanding the impression made on their minds by reading such confession, they can hear the evidence, give defendant a fair and impartial trial and a true verdict render acording to the law and evidence, they are not disqualified to sit as jurors in the case.

6. ———: **Challenge to Array.** A challenge to the array must be in writing. It cannot be made verbally, and a verbal challenge that the members of the panel have formed opinions of defendant's guilt from reading his confession cannot be considered.

7. ———: **Forming Opinions: Newspaper Reports: Challenge for Cause.** A juror who has read newspaper reports, from which he has formed an opinion of defendant's guilt which he testifies it will take evidence to remove, is a competent juror, if he further testifies that he can fairly try the case.

8. **INSANITY: Confession: Preliminary Proof.** The defense being insanity, which is a question for the determination of the jury, it is not proper for the court, upon the offer of defendant's written confession by the State, to determine, as a preliminary question, whether or not defendant was insane at the time he made it, or to permit the defendant to first show, before it is admitted, that he was insane when he made it. The proper course is, where the confession is shown to be voluntary, to per-

State v. Church.

mit defendant, after the confession has been admitted in evidence, by cross-examination and otherwise, to show that at the time he made it he was insane, and thereby affect its credibility or destroy its force.

9. ———: **Statement Made by Deceased.** An offer to show by a witness that defendant's foster mother, who was killed at the same time deceased was, had said to him that defendant was insane, should be excluded, as the merest hearsay.

10. ———: **Examination by State's Physicians.** It is not error to permit physicians, who have visited defendant in jail and examined him, to give evidence as to his mental condition.

11. **CONFESSION: To Prosecuting Attorney.** Confessions made by defendant while under arrest to the prosecuting attorney, who informed him of his rights and notified him before he made any incriminating statements that anything he said with respect to the homicide would be used against him at the trial, are properly admitted in evidence.

12. **DRUNKENNESS: No Evidence: Instruction Nevertheless.** An instruction to the effect that drunkenness is no excuse for crime, where there is no evidence that defendant at the time he committed the crime was intoxicated, is not prejudicial error. At most it amounts to a mere abstract proposition of law. Especially should such an instruction not be held reversible error where the only excuse for the crime contended for is that defendant was insane.

13. **REMARKS OF COUNSEL: Pronouncing Defendant a Culprit.** The State's attorney in addressing the jury referred to defendant as a "culprit," and the court, upon objection, said to the attorney: "Be careful about the terms you apply to the accused." Thereupon the attorney corrected his statement by saying: "The accused, then, the accused upon trial." *Held*, that the attorney by this last remark in effect withdrew the objectionable term, and the court did not commit reversible error in refusing to reprimand the attorney.

14. **NEW TRIAL: Newly-Discovered Evidence: Cumulative.** Although the newly-discovered evidence set forth in the affidavits filed in support of the motion for the new trial might have been properly admitted at the trial in support of the defense of insanity, yet if it is merely cumulative or would not probably produce a different verdict if a new trial were granted, no error was committed in overruling the motion.

Appeal from Warren Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

AFFIRMED.

*Claude R. Ball* and *P. H. Cullen* for appellant.

(1)   The judge who was disqualified to sit in this case, on being disqualified, set the case for immediate hearing, and the judge who tried this case immediately took the bench and without regard for the rights of defendant, called the case for trial, which was an abuse of judicial power. Such act was against reason, right and justice.   (2)   The court erred and abused its discretion in refusing defendant's application for a continuance.   (3)   The court erred in refusing defendant a special inquisition to try his insanity, two applications having been filed, one on June 20th, which was duly verified by competent physicians, and the application renewed on the 27th of June, 1904, as the law does not countenance the trial of an insane person for any offense until he recovers. State v. Klinger, 43 Mo. 130; U. S. v. Lancaster, Mey. Fed. Dec. 190; Frith case, 22 How. St. Tr. 307; State v. Reed, 41 La. 581; Freeman v. People, 4 Denio 9; Taffee v. State, 23 Ark. 24; State v. Peacock, 50 N. J. L. 34; Kinloch's case, 18 How. St. Tr. 395; People v. Farrell, 31 Cal. 576; Underwood v. People, 32 Mich. 1; State v. Harrison, 36 W. Va. 729; French v. State, 93 Wis. 325; Nobles v. Georgia, 168 U. S. 398. The question involving the right of one charged with crime to have his insanity inquired into is most thoroughly discussed in 38 L. R. A. 577.   (4) Public propriety and decency, if for no other reason, demands that an inquiry as to the present sanity of a person accused of a crime be had before a jury before he is put upon trial. Carr v. State, 98 Ga. 89; Spann v. State, 47 Ga. 549; Baughn v. State, 38 L. R. A. 577.   (5)   Where there is doubt of the sanity of a person accused of crime, he must not be put upon his trial, but a jury must be impaneled to try the fact. In this case the judge who tried this case admitted in overruling the defendant's application for a jury to try his insanity that

the evidence was plain that defendant was insane, but that that was a defense. 4 Bl. Com., 24, 25, 396; Bishop, New Crim. Proc., 666, 667; State v. Peacock, 50 N. J. L. 34; Guayando v. State, 41 Tex. 626; Gruber v. State, 3 W. Va. 669. (6) The court erred from a legal, moral and decent standpoint in overruling the application. Lee's case, 1 Lewin C. C. 239; Gruber v. State, 3 W. Va. 699; Weber v. Com., 119 Pa. St. 223; People v. McElvaine, 125 N. Y. 596; State v. Harrison, 36 W. Va. 729. (7) The right to inquiry into insanity of defendant is by implication part of the bill of rights. State v. Wade, 161 Mo. 441; Bishop, New Crim. Proc., 666, 667; Re Spies, 123 U. S. 153; Ball v. U. S., 140 U. S. 129; Schwab v. Berggren, 143 U. S. 448. (8) The record in this case will not sustain a conviction for it does not show that defendant was present on June 27th when his motion to determine his insanity was denied, and it does not show that defendant was present when the twelve jurors were called and sworn to try this case. The record is insufficient and does not show the qualification of forty jurors; neither does it show that twelve jurors were ever selected to try the case; neither does it show that any jury was selected to try this case, and for this reason the judgment should be reversed. State v. Schoenwald, 31 Mo. 147. (9) The court erred in accepting the forty jurors named in the statement of this case, because from their examination it was shown that they had read the defendant's written confession published in the papers, which publications were a true copy of the confession set out in our statement and introduced in evidence. (10) Each and every juror, from his examination, showed that he was both biased and prejudiced and had made up his mind as to the guilt of defendant. (11) The twelve jurors who actually sat in this case showed by their examination that they were not a qualified jury to sit in the case, and the court erred in accepting them because the jury that actually

199 Sup.—39

tried the case were guilty of misconduct for the various reasons set out in defendant's motion for a new trial. State v. Avery, 113 Mo. 503; State v. Collins, 86 Mo. 249; State v. Culler, 82 Mo. 623; State v. Foley, 144 Mo. 609. (12) The court erred in admitting the written confession signed by defendant to be read to the jury for the reason that counsel objected to its introduction on the ground that defendant was at the time of signing insane, and offered to introduce proof to the court, which was refused. State v. Kinder, 96 Mo. 548; State v. Young, 119 Mo. 518; 6 Am. and Eng. Ency. Law, 556, 559. (13) The admissibility of a confession depends upon mental capacity to make it. 6 Am. and Eng. Ency. Law, 556-559. (14) Statements made by the accused in writing are not admissible for any purpose. State v. Marshall, 36 Mo. 400. (15) A person not capable of committing crime is not capable of making confessions. 6 Am. and Eng. Ency. Law, 569. (16) In reason and justice there should be no trial if the defendant is insane, or from any other cause incapable of understanding the proceedings and making his defense. 1 Bishop's New Crim. Proc., 950. (17) Insanity, whether proceeding from drunkenness or any other cause, renders the confession inadmissible. Bishop's New Criminal Proc., 1229; State v. Feltes, 51 Iowa 495. (18) The capacity to be tried, which must exist at the time of trial, differs from that for crime required when a wrongful act is done. If an indicted person is not sane, the court cannot go on with the case; or if he becomes insane after the trial commences, he can neither be sentenced nor, if sentenced, punished while his insanity continues. 1 Bishop's New Crim. Law (1892 Ed.), 396; State v. Jones, 13 Ala. 153; State v. Ah Ying, 42 Cal. 18; State v. Patton, 12 La. Ann. 288; 2 Bishop's Criminal Procedure, 666-668. (19) The court erred in refusing defendant the right to cross-examine his witness, George Crouch. State v. Coate, 173 Mo. 396. (20) The court erred in not reprimanding counsel for the prosecution when he

referred to the defendant as a "culprit," which was error. State v. Taylor, 134 Mo. 157; State v. Bobbst, 131 Mo. 328. (21) The court erred in permitting doctors to testify as to the condition of defendant both physically and mentally, for the reason that they called upon defendant and examined him without an order of court and without knowledge or consent of defendant's counsel, for the reason that such examination, when made by the doctors voluntarily, is privileged, and not admissible. This proposition is so simple that authorities to sustain it are unnecessary. (22) The court erred in permitting the prosecuting attorney to testify to conversations with defendant over his objection. State v. Hagan, 164 Mo. 654. (23) The court erred in refusing to instruct the jury that if they found from the evidence that defendant was insane at the time of killing and was still insane, he would be sent to and confined in the state hospital for the insane. (24) The defendant, as shown by the record in this case, and as recited in his motion for a new trial, has been denied the constitutional right of trial by an impartial jury of Warren county, as is guaranteed by the 6th amendment of the Constitution of the United States and section 22, article 2, of the Constitution of Missouri. Hunt v. Searcy, 167 Mo. 177. (25) The record shows that defendant has been tried and convicted without due process of law, in this, that defendant has been denied the right to appear and defend in person. (26) The court erred in overruling defendant's motion for a new trial upon the ground of newly-discovered evidence. State v. McKenzie, 177 Mo. 716. (27) This case should be reversed because it does not affirmatively appear, from the record, that defendant was personally present, either at the time the jury was impaneled or at the time a jury was sworn to try the case. Neither does the record show that defendant was personally present at the beginning of the trial. This omission in the record must result in the reversal of the judgment of convic-

tion, under the statute. Sec. 2610, R. S. 1899; State v. Schoenwald, 31 Mo. 147.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1)   Much stress is laid by appellant on the fact that Judge Johnson set this case for trial at the time that he called upon Judge Shelton to try the case. How appellant could have been injured by that act, it is impossible to understand. Counsel seemed to have overlooked our statute, which provides that whenever a change of venue is granted on account of the prejudice of the judge, "the judge of said court shall set the case down for trial on some day of the term, or on some day as early as practicable in vacation, and notify and request the judge of some other circuit to try the cause; and it shall be the duty of the judge so requested to appear and hold the court at the time appointed for the trial of said cause," etc. R. S. 1899, sec. 2597. (2) Defendant's application for a continuance was properly overruled, as no diligence whatever was shown. State v. Cummings, 88 S. W. 706; State v. Dusenberry, 112 Mo. 291; State v. Kindred, 148 Mo. 281; State v. Woodward, 182 Mo. 415; State v. Sublett, 191 Mo. 170. (3) Defendant filed two applications, each one asking the court to summon a jury to pass on the question of defendant's insanity. But the statute, which defendant attempted to call to his aid, is not applicable to the facts developed by defendant's evidence. Defendant's position in this case was a shifting one, and anything but consistent. Defendant's attorney first filed an affidavit stating that defendant was insane; and afterwards amended the same by inserting therein that he became insane after the commission of this crime and since the filing of the information. The only witness on this subject for defendant, Dr. Hudson, testified that he knew defendant for a long time prior to the commission of this crime,

and that defendant was insane then, and was insane from that time on up to the time of the giving of this testimony; and that his mental condition had been growing steadily worse. If this was true, and defendant was most assuredly bound by it, then defendant was not entitled to a jury to first pass on his sanity.   Sec. 2603, R. S. 1899; 2 Bishop's New Crim, Proc., sec. 666.   (4) The record shows that defendant was present at the beginning of the trial; and, in the absence of a showing to the contrary, this court will presume that he was present throughout the trial.   State v. Brock, 186 Mo. 461.   The amended copy of the record shows the impannelling of the forty composing the panel, and also of the selection and swearing of the twelve.   (5 ) No error was committed in the selection of the forty, from which a jury was selected.   Some of them stated that they had read portions of the evidence, as published in the St. Louis and Warren county newspapers; but all said that they could and would give defendant a fair trial.   Not content with their general statements, defendant went into detail and asked them if they would acquit defendant in the event the evidence showed him to be insane; and all of them replied in the affirmative.   Certainly defendant could not have wanted a fairer jury; he was surely not entitled to one.   Opinions formed by reading the newspaper accounts of the homicide do not disqualify jurors, as has been said by this court many times. State v. Duffy, 124 Mo. 129; State v. Hunt, 141 Mo. 630; State v. Walton, 74 Mo. 270; State v. Cunningham, 71 Mo. 382; State v. Brennan, 164 Mo. 487; State v. Robinson, 117 Mo. 649; State v. Shackelford, 148 Mo. 493; State v. Reed, 137 Mo. 125. The record shows that defendant made no objections to a number of the jurors; hence, as to them, there is a clear waiver of any objection.   As to the others, defendant simply objected without stating the reasons for such objections.   On account of his failure to comply with the law on this subject, defendant has waived any objection to them.

State v. Taylor, 134 Mo. 143; State v. Duestrow, 137 Mo. 65; State v. McCarver, 92 S. W. 684. (6) Appellant's counsel insist that every one of the jurors was incompetent to sit in this case, and that his challenge to the array should have been sustained by the trial court. It has already been seen that they were qualified; but defendant is in no position to complain, as his counsel did not in writing challenge the array, as is required by law. State v. Brennan, 164 Mo. 504; State v. Clark, 121 Mo. 513; State v. Taylor, 134 Mo. 143. (7) The court properly admitted in evidence defendant's written confession, the evidence showing that it was voluntary, and that no promises were offered to him, no threats made and no inducements held out. After hearing the preliminary proof, the court held said confession to be competent; and in doing so, no error was committed. This has been considered the proper course to pursue for many years. State v. Patterson, 73 Mo. 695; State v. Hopkirk, 84 Mo. 278; Reed v. State, 69 Ala. 259. In Minnesota the court held that a confession was admissible in evidence, even though the defendant was intoxicated at the time he made it. State v. Grear, 28 Minn. 426. And the California court held that a confession, made to an officer, was admissible, even though the defendant was intoxicated on liquor given him by that officer. People v. Ramirez, 56 Cal. 533. See, also, Jefferds v. People, 5 Parker Cr. R. 547; State v. Feltes, 51 Iowa 496; Com. v. Howe, 9 Gray 110; State v. Haworth, 24 Utah 398; Wharton on Crim. Evid. (9 Ed.), sec. 635; Underhill on Crim. Evidence, sec. 136; White v. State, 32 Tex. Crim. 625. Confessions made as these were were evidence at to the condition of defendant's mind. If he knew all of the details connected with the homicide, knew all of the efforts he made to leave the country, and knew all of the places he visited and things he did while evading the officers for nearly seven months, then the jury and court could easily draw the inference (and it was a nat-

ural and strong inference) that he knew enough to know that it was wrong to kill. If, prior to receiving evidence from any of the State's witnesses, and each time the State offered a witness, the court should stop and hear evidence pro and con on the subject of defendant's sanity, and have a jury to pass on that question as many times as industrious counsel desired to raise the same, then this trial would have been drawn out to even greater lengths than it was and, if such a rule should be followed, the administration of justice would be permanently retarded. (8) According to the authorities just cited, the admissibility of a confession is not dependent upon the mental capacity of a defendant to make it. Said confessions were, therefore, properly received in evidence; but if not, defendant was not injured thereby. By his plea of insanity, defendant admitted the commission of the criminal act, but interposed as a defense thereto, that his mental condition was such that he could not distinguish between right and wrong. Judge SHERWOOD, in State v. Pagels, 92 Mo. 309, said that such a defense was in the nature of a plea of confession and avoidance, and that it was wholly immaterial to discuss whether or not dying declarations (or, as in this case, defendant's confessions) were properly received in evidence. This decision in the Pagels case was quoted approvingly, with the concurrence of all of the members of this court, in State v. Welsor, 117 Mo. 579. (9) No error was committed in admitting in evidence the statements to the prosecuting attorney and to the police officers of Philadelphia. The fact that defendant was talking to officers, and under arrest at the time, did not make such statements privileged. The gentlemen testified that no inducements were held out to him, no threats made and no promises or rewards offered. In addition, they testified that they cautioned defendant that whatever he said could be used as evidence against him. This is all that the law requires, and all that defendant was entitled to. State v. North-

way, 164 Mo. 513; State v. Bradford, 156 Mo. 91. Defendant's offer to prove that he was insane at the time he made said confession amounted to nothing; and his objection on that account was frivolous. No court has ever yet held that the State should be deprived of all, or any part, of its evidence, simply because counsel for defendant stated (and that, too, without being sworn) that his client was insane at the time, that he believed that he could prove that fact, if given an opportunity. When the proper time came, defendant was given ample opportunity and attempted to prove his insanity; but it is doubtful if the criminal records furnish a case where there was such a total failure of proof. "The presumption is that confessions have been freely made until the contrary appears." People v. Barker, 60 Mich. 295; State v. Myers, 99 Mo. 119; Com. v. Culver, 126 Mass. 464; 1 Chitty's Crim. Law, 571; Roscoe's Crim. Evidence, 43; 3 Rice on Crim. Evid., sec. 309. The fact that the confession was made to an officer after the defendant had been arrested did not tend to prove that any undue influence was used, or that any threats were made or promises held out. State v. Jones, 171 Mo. 406; State v. Brennan, 164 Mo. 487; State v. Guy, 69 Mo. 432; State v. Simon, 50 Mo. 372; State v. Davis, 53 Pac. 682. In a case where a defendant was arrested but escaped by jumping off of a train, and was re-arrested, he asked the two officers in charge of him what he was wanted for. On being told that it was for rape, he contradicted them by saying that he knew better, it was for seducing a young girl. This confession of his was held admissible, although no warrant had been read to him and he was then confined in jail in Rogers, Arkansas. State v. McClain, 137 Mo. 315; State v. Vaughan, 152 Mo. 75; State v. Anderson, 96 Mo. 248; State v. Patterson, 73 Mo. 703; State v. Hopkirk, 84 Mo. 278.

BURGESS, P. J.—Under an information duly filed in the office of the clerk of the circuit court of Warren county, by the prosecuting attorney of said county, charging the defendant William E. Church with murder in the first degree, in killing one Henry W. Yeater at said county on the 31st day of August, 1903, by cutting his throat with a razor, he was convicted in said court, at its June term, 1904, of murder in the first degree as charged, and his punishment fixed at death. He appeals.

At the time of the homicide the defendant was about twenty-two years of age, and had lived most of his life with deceased and his wife, Mrs. Yeater, who had taken him, when a boy about nine years of age, to raise. They lived upon a farm about seven miles north of Warrenton in Warren county. When the defendant was about fourteen years of age he was charged with some petty offenses, among which was the theft of a watch, to which he pleaded guilty, and was sent to the State Reform School for boys at Boonville, where he remained about one year, when he was pardoned and returned to his home with the Yeaters.

On Saturday, August 29, 1903, defendant attended the old settler's reunion in Warrenton and was seen by many persons who were also in attendance, talked with them and mingled in the crowd "just like any body else." On this same day, defendant went to see certain persons and endeavored to get them to assist him to put a roof on the house which was occupied by Mr. and Mrs. Yeater; he purchased $60 or $70 worth of roofing, paid for same, and received some change back, indeed, transacted the business in a businesslike manner. On the next day, Sunday, the defendant attended preaching at a neighborhood church, and did not return home until about 11 o'clock p. m. What happened at the Yeater home that night is not known except through the confessions and statements made by the defendant thereafter. The next afternoon the rural letter carrier

found a letter in the mail box near the Yeater home tell-ing of the trouble there the night before, which letter was identified as being in the defendant's handwriting. Before this letter was written, the defendant changed his clothing, concealed his bloody trousers and shoes in a corn field some distance from a private road, pre-pared a lunch, took his picture with him, packed his grip and started to walk to the M. K. & T. railroad, which was on the extreme south side of said county. Defendant crossed the Wabash railroad tracks in going south that morning, selected a road through the woods and was seen eating his lunch about noon. He first went to a station called Gore, but finding that there was no agent there, and that the train which he desired to take did not stop there, he walked to another station two or three miles distant, named Case. The agent at Case was engaged in other business besides representing the railroad company, and defendant went to his store and purchased a ticket to St. Louis. While waiting for his train, defendant went to a corn field close by, where he changed his clothing, and returned about half an hour before his train was due. The stations of Gore and Case had no telegraph nor telephone communica-tions. Defendant took the 2:30 train that afternoon for St. Louis, and as soon thereafter as possible left St. Louis for Chicago. He was heard of in Chicago, in Milwaukee and in Cleveland; while in Chicago he joined a labor organization or agency and secured employ-ment on the Chicago, Milwaukee and St. Paul railroad, and afterwards on the Great Western railroad. At Cleveland, defendant enlisted in the United States Navy and in a short time was sent to a post near the city of Philadelphia. While in Chicago, defendant adopted the name of Buescher, and under this assumed name he was known in the various other cities where he worked, and also in the Marine service. Under this assumed name, defendant wrote to the prosecuting at-torney, to a neighbor and to a lady in Warren county.

These letters were the means of the officers discovering where he was and of his arrest.

In March, 1904, detectives Gallagher and Lynch went to the barracks where defendant was stationed and in company with Jack Young arrested defendant. When arrested, Mr. Young asked defendant if he knew him, and defendant replied that he had never seen him before. A few days later these officers searched defendant and found in his pocket a copy of a Philadelphia newspaper giving an account of the arrest of defendant and of the crime with which he was charged. After notifying him of his rights and of his privilege to say nothing, and assuring him that whatever he said could be used against him, defendant made a written confession to these officers, which was duly signed and witnessed. Said confession is as follows:

"Philadelphia, March 29, 1904.

"I, William E. Church, of Warrenton, Missouri, of my own free will and accord, hereby make the following statement, without any promise or inducements being held out to me whatever:

"On the night of August 31, 1903, I had been to church at Truxton, I arrived home about 11 p m. and then went and drank a lot blackberry wine; about 1 a. m. Monday morning, September 1, I was going upstairs when Mr. Yeater called me in his room and asked me where I had been; I told him I had been to church; I then left his room and went to my room and stayed there a short time; then I went to a cigar box in my room and got my razor where I always kept it; then I went down to the first floor front, Mr. Yeater was laying in bed and I cut his throat; I throwed my left hand around his forehead to hold him down, while I cut his throat; I then satisfied myself that he was dead.

"I then went over and cut Mrs. Yeater's throat, who was in the other bed, this room contained two beds, Mr. Yeater occupied one and Mrs. Yeater the other; after I cut Mrs. Yeater's throat she hollered two or

three times; she fell out of bed after I took my hands off her; I cut her probably five times but I do not positively know how many times; I then wrote a note for the mail carrier and put it in the mail box; I then took a few of my things and started for Gore, Missouri, which was about 17 miles away; I changed my clothes in the corn field and throwed them away because they had blood on them.

"At Gore, Missouri, I bought a ticket for St. Louis, Missouri, before I left the depot I bought a ticket for Chicago and left the same night; I arrived in Chicago about 6 a. m. on Tuesday morning, I secured a job in Adam's freight yard and worked there until Saturday night; I had six dollars after I had paid my board; I left there the following morning for Ottumwa, Iowa, I worked on the railroad in an extra crew of the Chicago, Milwaukee and St. Paul railroad; worked for them two weeks; I then went back to Chicago, arrived at 8 a. m. and left at 9 p. m. for Waverly, Iowa, and got a job laying steel on the Great Western railroad; I stayed there two days and then went to Minneapolis and got a job on the Great Northern railroad as one of an extra train crew; I stayed there six weeks and then went to Duluth; I worked there on the docks there for two weeks, and then left on a boat for Buffalo; I was there one week; while there, I wrote a letter to J. E. Young; I told him in it I would return in July and kill him if he did not leave Warrenton; I then sailed over to Asthubula, Ohio, over the lake; I was there two days and then went to Cleveland, Ohio, and enlisted in the United States Marine Corps on the 22nd of December, 1903; I left Cleveland on the 31st of December, 1903, for League Island Navy Yard, Philadelphia.

"I got there on the first day of January at noon; I have been there ever since until my arrest, on Friday, the 25th day of March, 1904.

"WILLIAM E. CHURCH.

"Witnesses:

 JAMES TATE, SR.,

  EDWARD A. GALLAGHER,

  JOHN H. LYNCH."

The sheriff of Warren county, accompanied by prosecuting attorney Garber, brought defendant from Philadelphia to St. Louis.   On the road these officers again told defendant that he could not be compelled to talk; that anything he said might be used against him, etc., and asked him certain questions in regard to this tragedy.   The defendant told the officers that he was anxious to join the army; that he believed Mr. Yeater did not intend to give him any money; that when he returned to his home that Sunday night, Mr. Yeater spoke to him about being out so late; that he went to his room, laid down on his bed for a short time, got up, went to the basement and drank a lot of blackberry wine to brace him up; that he then took his razor out of a cigar box, went into Mr. Yeater's room, finding him asleep, and cut his throat; that Mrs. Yeater was aroused and that he had quite a scuffle with her, but succeeded in cutting her throat also; that he then went to a cornfield close by and hid his bloody clothes and put on his Sunday clothes; that he took his grip, prepared a lunch and started to leave; that he walked across the Wabash track along south some miles to the M. K. & T. track, where he went to two stations, at the first of which he could not buy a ticket, but at the second one he bought a ticket, and while waiting for the train went to a cornfield and changed his clothes. Then as soon as he arrived in St. Louis he was afraid to stay there, so went to Chicago as soon as he could; that while in Chicago, he went to a labor agency and secured employment, but that he did not like to stay there for fear of detection, but as there was so much trouble just then over the car barn fire he felt comparatively safe, as the whole time of the police was occupied in investigating those implicated in that; that

whenever he would see a policeman or detective looking at him, he would walk straight up to him and ask the way to some place in the city; that he worked for two railroads, went to Cleveland, enlisted in the Marine service of the United States; that he wrote to the young woman in Warren county hoping he could get up a correspondence with her.

The evidence for the State further tended to show that the wounds inflicted by the defendant upon Mr. and Mrs. Yeater were fatal, death resulting instantly.

On behalf of the defendant, his counsel endeavored to show that he was of unsound mind, and a large number of witnesses were introduced upon that subject.

Mr. L. D. Drake, superintendent of the Boys' Reform School at Boonville, testified to his acquaintance with the defendant during the ten or twelve months he was in said school; that the defendant was not a bright boy, and he never considered him strong mentally. That defendant was then addicted to the habit of self-abuse; and it became necessary to put night gloves on him for a time. On cross-examination, however, this witness admitted that he never thought defendant was insane; if he had shown signs of that, he would not have been allowed to remain in the reform school; that the defendant was industrious and worked whenever he was told to do so; that he understood what he was there for and understood every command that was given him; that Mrs. Yeater seemed very much interested in the boy and finally came to the school with an order from Governor Stephens for his discharge.

A number of other witnesses were introduced by the defendant who testified that they had attended school with defendant for several years, and some of them had visited him, played ball with him, played base and whip cracker. While they all expressed a dislike for him at school and admitted that he was not popular, that he was mean and hard to get along with, especially so far as the younger pupils were concerned,

they all stated that in their judgment he was of sound mind, and they never heard his mental capacity called in question any more than any other boy in school.

Many of the neighbors, men. and women, were placed upon the stand by defendant, and they, too, told of his conduct, such as breaking window glass in the schoolhouse and in the Granger Hall, and one of them told of his shooting a dog and another that he kicked a baby buggy over and hurt the occupant, but that they all attributed his conduct to meanness and not to insanity.

Defendant also placed a woman on the stand who did washing for the Yeater family, and who heard a discussion between Mrs. Yeater and defendant a few days before the murder; that Mrs. Yeater said that everything on the place would belong to Willie (meaning defendant). She too gave it as her opinion that he was of sound mind and understood his business just like any one else. The teacher, whose school defendant attended, admitted defendant's unpopularity and sometimes rough and rather cruel conduct, especially toward the smaller boys, but she too believed he was of sound mind.

While defendant was in the city jail in St. Louis, he made statements to representatives of the press, and told them of the crime he had committed, at the same time talking as if he thought he was still connected with the Marine service of the United States and that the commandant would come for him as soon as the trial was over.

Jailor Dawson of St. Louis testified to seeing defendant for a number of days during his stay in that jail, and that defendant's actions were such as to lead him to believe that defendant was then of unsound mind. Having had considerable experience with criminals, both sane and insane. Mr. Dawson was asked the hypothetical question, that if defendant had changed his clothing after the commis-

sion of such a crime, had fled the country, had changed his name and joined the marine service of the United States, would he be of the opinion that defendant was of sound mind during the time of such conduct, and he replied promptly that those things indicated deliberation and an effort to evade the law, and in his judgment must of necessity be done by one of sound mind.

Two jail guards from St. Louis testified to defendant's conduct while in the city jail. One of them saw him in the act of self-abuse on one occasion; and the other guard saw him several times. When thus engaged, defendant would walk up to the door of his cell, so that the guards in the hall could see him. They testified that they tried to persuade him to desist and tried to shame him, but without success.

Two physicians testified to examining defendant while he was in the St. Louis jail, and while he was in Warrenton during the trial; and both gave it as their opinion that he was of unsound mind. One physician, who was employed as an expert, gave it as his opinion that defendant had "reasoning insanity." One of these physicians, Dr. Hudson, testified to his acquaintance with defendant and visit to the Yeater home some months prior to the homicide, and that it was his opinion that defendant was then insane.

In rebuttal, the State produced five physicians who testified that they had watched defendant through the trial, had examined him carefully in the Warrenton jail, and that it was their opinion he was of sound mind. They also stated that the defendant's conduct at the time of and since the commission of the homicide indicated that he had good reasoning powers and was of sound mind. These physicians further testified that the fact that he had been guilty of excessive masturbation did not indicate that defendant's mind was impaired nor that he had any mental trouble whatever.

The court instructed the jury upon murder in the

first degree, flight, want of motive, insanity, drunkenness and reasonable doubt.

In due time after verdict defendant filed motion for a new trial, assigning thirty grounds therefor, but only such as are discussed by counsel for defendant will be adverted to. Other facts will be stated in the course of the opinion.

The defendant was arraigned at the April term, 1904, of the circuit court of Warren county, and Judge Johnson, the regular judge of said circuit, being disqualified, he called in Judge Shelton of the second judicial circuit to try this case, and it was set for immediate trial. Judge Shelton being present, took the bench and called the case for trial. Defendant contends that this was in disregard of the rights of defendant, and an abuse of judicial discretion, but in what way the rights of defendant were prejudiced by such action, or in what way it was an abuse of judicial discretion, we are not informed, nor are we able to perceive. The statute (section 2597, R. S. 1899) provides that whenever a change of venue is granted on account of the prejudice of the judge, "the judge of said court shall set the case down for trial on some day of the term, or on some day as early as practicable in vacation, and notify and request the judge of some other circuit to try the cause; and it shall be the duty of the judge so requested to appear and hold the court at the time appointed at the trial of said cause;" and what difference it could make to defendant or in what way or manner his rights were in any way prejudicially affected by the mere fact that Judge Shelton was in the court house at the time he was called try the case and then proceeded with it, we are unable to see.

The information was filed on the second day of September, 1903, in vacation of court, and at the April term, 1904, of said court, defendant, who in the meantime had been arrested on the information, waived for-

199 Sup.—40

mal arraignment and pleaded not guilty to the information. Thereafter at the adjourned April term, 1904, of said court defendant by his attorney filed his application, alleging that the defendant was then insane, and had become insane since the filing of the information and the commission of the offense, and on account of the perverted and deranged condition of his mental and moral faculties the said William E. Church was by reason thereof incompetent and incapable of testifying in his own behalf as the law permitted him to do, or to be of any assistance to his counsel in the conduct of his trial; and prayed the court to order a summons to issue for a jury to decide the question as to the insanity of the said William E. Church, as provided by section 2603, Revised Statutes 1899. After hearing evidence upon behalf of the defendant which conclusively negatived the assertion that he had become insane after the filing of the information, the court overruled the motion, and defendant excepted.

Again on the 27th day of June, 1904, defendant's counsel filed another motion for an inquisition for the especial purpose of determining the insanity of the defendant Church, and that a jury be summoned for that purpose. This motion is based upon substantially the same grounds as the former one, except that it does not ask that the inquisition be held in accordance with section 2603, supra. This motion was also overruled and defendant saved an exception. It is now earnestly insisted by counsel for defendant that the court committed error in overruling both of said motions.

In criminal procedure at the common law, if the question of the insanity of the person upon trial is raised, it may be tried, in the discretion of the court, either by special jury impaneled for that purpose, or by the jury who are to try the indictment; yet inspection of the accused by the judge without a jury is permissible. [2 Bishop's Crim. Proc., sec. 666, and authorities cited.] But under the practice in

this State, if the accused is insane at the time of the commission of the offense with which he is charged, this is tried by the jury charged with the trial of the indictment or information, and in this way his insanity, if proven, is available as a defense; but if he becomes insane after he is indicted or information is preferred against him by the proper officer, and before his trial for the offense, and the court having cognizance of the case should have reason to believe that he has so become insane, this preliminary question is made the subject of statutory regulation (sec. 2603, R. S. 1899), and it is made the duty of such court to suspend all further proceedings against such person under said charge and to order a jury to be summoned to try and decide the question of the insanity of such person, etc.

Section 2604, Revised Statutes 1899, provides that "if upon such inquiry the said jury shall become satisfied that such person has so become insane, they shall so declare in their verdict, and the court shall, by proper warrant to the sheriff, marshal or jailor, order such person to be conveyed to the lunatic asylum and there kept until restored to reason." Section 2605 provides that "when such person shall be restored to reason, he shall be returned to the county whence he came, and the proceedings against him shall be continued and be prosecuted, and his trial had as though no such inquiry and proceedings thereon, as herein provided, had been made, and if upon such inquiry it shall be determined that said person has not so become insane as aforesaid, the criminal proceedings against him shall be continued and prosecuted, and his trial had in the same manner as though no such inquiry had been made and had."

It will thus be seen that a person who is insane at the time of the commission of a criminal offense, and is afterwards indicted or informed against therefor, when put upon trial for the offense, may avail himself of his insanity as a defense to the charge against him, or, if he becomes insane after indictment or information

presented against him, his insanity may be inquired into by a jury as provided for by statute, and in this way his rights are as fully protected and every opportunity afforded him to avail himself of his insanity, if insane, as are afforded him at common law.

In our opinion the court did not err in overruling the motions.

It is insisted that the record does not show that defendant was present on June 27th, when the motion to determine his sanity was denied, nor that the defendant was present when the twelve jurors were called and sworn to try the case.

Although the record may fail to show affirmatively that defendant was present in court on the special occasions mentioned, it does show that he was present in court when the case was called for trial, was "arraigned and pleaded not guilty," and that after the information was amended he again appeared thereto, "waived formal arraignment and pleaded not guilty," which clearly shows that defendant was present in person at the time of his arraignments (State v. Hunter, 181 Mo. 316); and in the absence of anything in the record showing to the contrary it will be presumed that he was present throughout the trial. The record, as amended, also shows the impaneling of the forty composing the panel and the selection and swearing of the twelve jurors that sat upon the trial of the cause.

A broadside, as it were, is fired at the panel of forty, with respect to which it is claimed that error was committed in their selection in that by their *voir dire* examination it was shown that they had read the defendant's written confession of his guilt in one or more newspapers, from which practically all of them had formed opinions of his guilt which would take evidence to remove. But each and every one of them who had formed an opinion as to defendant's guilt answered that he could, notwithstanding the impression made upon his mind by the reading of said confession, hear

the evidence, give defendant a fair and impartial trial, and a true verdict render according to the law and evidence.

This kind of challenge appears to have been considered by counsel for defendant as a challenge to the array, which he insists should have been sustained by the court. But as we have already ruled, they were qualified. Moreover, at common law, and the rule has never been changed by statute, a challenge to the array is required to be in writing, while in the case at bar it was merely verbal, therefore insufficient. [State v. Clark, 121 Mo. 500, and authorities cited; State v. Taylor, 134 Mo. 109; State v. Brennan, 164 Mo. 487.]

The twelve jurors who were selected to sit upon the trial of the cause, viz., Charles Kunze, Fritz Paul, Thomas Hodges, William Grame, August Ritter, Charles Feldman, Thomas Kite, William E. Otterman, Albert Ashman, Henry Dunker, Charles Sennart and Charles Hess, were challenged for cause.

The following is the material portion of the examination of Fritz Paul: "Q. You say you read of this offense in the Folksfriend? A. Yes, sir. Q. Did that make any impression on your mind as to the guilt or innocence of the defendant? A. I think it ought to. Q. Did it? A. Yes, sir, it did. Q. From what you know about this case, by reading about it, you have discussed it and talked about it with your neighbors? A. I don't know that I have talked about it much; of course I have once in a while. Q. From what you have read and heard about this case would it take evidence to remove the impression you have upon your mind now? A. Yes, sir." Examined by Court: "Q. Now, Mr. Paul, could you notwithstanding that impression made by that article (Mr. Ball, counsel for defendant, called your attention to), that is mere newspaper rumor, could you hear the evidence and a true verdict render according to the law and evidence? A. Yes, sir." By Mr. Ball: "Q. It would take evidence to remove the

impression you have in your mind now? A. Yes, sir. Q. Now if the defense in this case should be a plea of insanity and the defendant should be proven insane to your reasonable satisfaction would the prejudice and bias you have on your mind prevent you from returning a verdict of not guilty on the ground of insanity? A. Yes, sir." By the Court: "Q. How? A. Yes, sir. Q. You don't mean to say that you have an impression that would induce you to ignore the testimony of his insanity? A. No, if they would testify that he was insane, I could say then that I could. Q. You mean to say this, if the defense should be insanity you have no bias which would prevent you giving due weight to the testimony as to his insanity, or sanity? you have no prejudice to prevent you weighing the testimony? A. No, sir. Q. And giving due credit to his sanity or insanity? A. That's right. Q. Then if the testimony satisfies your mind, reasonably so, that this party is insane would you say so in your verdict? A. Yes, sir. Q. By reason of insanity? A. Yes, sir."

This is a fair sample of what was stated by the other jurors who sat upon the trial of the case, all of whom stated in their examinations touching their qualifications that after hearing all the evidence in the case they could give the defendant a fair and impartial trial notwithstanding some of them had formed opinion from newspaper reports. It is therefore deemed unnecessary to set forth any part of their examinations, for if Paul was a qualified juror all the rest were, and if he was not qualified to sit in the case, the judgment will have to be reversed any way.

It is manifest from their examinations that the opinions of the jurors were based entirely upon newspaper reports and that neither they nor either of them had expressed any opinion as to the truth of such statements. It is evident that the trial court was satisfied of the truth of their statements, in every respect,

which is evidenced by the fact that the challenges to the jurors for cause were overruled.

The confession as published in the papers was part of those publications and the jurors having read them, including that confession, and formed opinions therefrom with respect to the guilt of the defendant, the case is clearly brought within the provisions of section 2616, Revised Statutes 1899, which provides that "it shall be good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." It has always been held under this statute that a person testifying on his *voir dire* in a criminal cause, that he had read newspaper reports of the case and had formed an opinion which it would require evidence to remove, but that he could try the case fairly, is a competent juror. [State v. Rose, 32 Mo. 346; State v. Duffy, 124 Mo. 1; State v. Hunt, 141 Mo. 626; State v. Walton, 74 Mo. 270; State v. Cunningham, 100 Mo. 382; State v. Brennan, 164 Mo. 487; State v. Robinson, 117 Mo. 649; State v. Shackelford, 148 Mo. 493; State v. Reed, 137 Mo. 125.]

It is said for defendant that the court erred in permitting to be read in evidence the written confession signed by defendant over the objection of defendant, because he was insane, with respect to which he offered to introduce evidence at the time, which offer was refused.

While the record discloses that the defendant was under arrest at the time he made the confession, it is well settled that a statement made by a prisoner is not involuntary because made after his arrest, and in actual custody at the time; besides, the preliminary proof showed very conclusively that it was voluntary and that no promises were offered to him, no threats

made, and no inducements whatever held out to him in order induce him to make it.

The confession was, therefore, properly admitted in evidence, unless, as contended by counsel for defendant, he should have been permitted, before its admission in evidence, to show that the defendant was insane at the time he made it. Upon this feature of the case we quote the following from the case of the State v. Haworth, 24 Utah 398:

"In the case of State v. Feltes, 51 Iowa l. c. 496, it is said: 'The first error assigned is upon the admission of the testimony of one Emma Squires. She was called to testify to certain confessions of the defendant. His counsel objected upon the ground that he was, at the time of the alleged confession, under the influence of intoxicating liquor, and was affected by *delirium tremens,* or otherwise insane, and they asked to be allowed to show by the witness herself, and other witnesses, that such was the fact, before she should be allowed to testify in regard to the confession, to the end that the court might sustain their objection to her testifying in regard to the confession, if the court should be satisfied that the defendant was affected with *delirium tremens,* or otherwise insane, or, at least, if her testimony was to be received, it should be after the jury had been made acquainted with the defendant's condition. . . . Evidence that the defendant, at the time of the alleged confession, was intoxicated or insane, was proper to impair or destroy the effect of the confession. The defendant was allowed to introduce such evidence upon cross-examination. But he complains that he should have been allowed to introduce it first, for the reasons above set out. In our opinion the court did not err. It was for the jury to determine what weight should be given to his confession, in view of his mental condition, as shown. [Com. v. Howe, 9 Gray 110.] The court, therefore, could not properly have excluded evidence of the confession. Nor do we think

it was the defendant's right to show his condition first, by way of preparing the mind of the jury against any undue impression from the evidence of the confession. The time when the jury was made acquainted with it must, we think, be deemed immaterial. They must be presumed to have given the evidence in relation to it its due weight.' In Com. v. Howe, cited in the above case, it is said: 'The court instructed the jury that the evidence of intoxication was an objection to the weight, and not to the competency of the testimony, and that, if the defendant was so much under the influence of liquor as not to understand what he was confessing, they should disregard the confessions altogether. These instructions were entirely right.' In Rex v. Spilsbury, 7 Car. & P. 187, Mr. Justice COLERIDGE said: 'I am of the opinion that a statement being made by a prisoner while he was drunk is not therefore inadmissible as evidence against him, and that, to render a confession inadmissible, it must be obtained either by hope or fear. This is a matter of observation for me, upon the weight that ought to attach to this statement when it is considered by the jury.' The statement was received. [State v. Grear, 28 Minn. 426, 10 N. W. 472, 41 Am. Rep. 296; Lester v. State, 32 Ark. 731; Jefferds v. People, 5 Parker Cr. R. 561; 6 Am. and Eng. Enc. Law, 570.] Wharton, in his work on Criminal Evidence (9 Ed.), sec. 635, says: 'We must also, applying the same tests as we have already applied to witnesses, inquire whether the defendant, at the time of the occurrence narrated, was capable of accurate observation. Hence it is admissible, in order to affect the credibility of the declaration, to show that the declarant was drunk or insane at such time.' In support of this statement the case of State v. Feltes, supra, is cited. In section 84 of McKelvey on Evidence, it is stated that 'the question as to the mental condition of the accused at the time of the making of the confession is held to be for the jury to determine, upon such evidence as both sides may submit.'

Neither the refusal of the defendant's request to place witnesses on the stand to show primarily the mental and physical condition of the defendant, nor the admission in evidence of the confession, Exhibit C, was error. In 1 Rosc. Cr. Ev. (8 Ed.), 90, it is said: 'If the confession is taken down in writing and signed by the prisoner, or its truth acknowledged by parol, or if it be written by him, then it is put in as an ordinary document, and read by the officer of the court.' [Rex v. Swatkins, 4 Car. & P. 550; State v. Demareste (La.), 6 So. 136; Peter v. State, 4 Smedes & M. 31; Murphy v. People, 63 N. Y. 590; 6 Am. and Eng. Ency. Law (2 Ed.), 576.]''

The defense being insanity, at the time of the commission of the crime and up to and during the trial, which there was evidence tending to show, its weight was for the determination of the jury, in view of the mental condition of defendant, as shown by the evidence, at the time the confession was made, as well as at the time of the commission of the crime, and in this way defendant received the full benefit of his contention, as much so as if he had been permitted to introduce evidence for the purpose of showing his insanity before the confession was read in evidence. Indeed, the question of insanity was for the determination of the jury and not for the court. We think the court pursued the proper and logical course, in refusing to permit defendant to introduce the preliminary proof of his insanity at the time his confession was offered in evidence.

During the trial the defendant offered to prove by Mr. L. D. Drake, superintendent of the Boys' Reform School, that Mrs. Yeater stated to him that defendant was insane. Upon objection by the State this evidence was excluded. What Mrs. Yeater may have said was the merest hearsay, and inadmissible from any standpoint. She was not a party to this case, and any statement that she may have made prior to her death, was

not binding on the State, and clearly inadmissible. [State v. Punshon, 124 Mo. 448; State v. Bauerle, 145 Mo. 1.]

The assertion is made by defendant's counsel in his brief, that the court erred in refusing to permit him to cross-examine his witness George Crouch, but he nowhere intimates why the court should have departed from the general rule which prohibits a party from cross-examining his own witness, which he may do, however, in the discretion of the court. Certainly no error was committed by the court in this instance.

The point is made that error was committed in allowing certain physicians to visit the jail and examine the defendant and then give evidence for the State as to his mental condition. But we are unable to agree to this contention. The defendant made no objection to the examination, but submitted to it. In State v. Jones, 153 Mo. 457, it was held that it was proper for the sheriff in charge of the defendant, and a physician who was present, to testify that the defendant, in compliance with the request of the sheriff, showed them his leg, and to thereafter testify in behalf of the State as to the condition of his leg, and that they discovered bruises and discolorations which were the result of a human bite. There was other evidence tending to show that in the difficulty between the prosecuting witness, and the man who assaulted and robbed him, the prosecuting witness bit the man who assaulted him on the leg. [State v. Tettaton, 159 Mo. 354.]

In the case of People v. Truck, 170 N. Y. 203, the defendant was upon trial for murder. The defense was insanity, and the taking of the defendant by the sheriff to a room, outside of the jail, and the examination of him by the experts employed by the People, was claimed by the defendant as being improper as compelling him to be a witness against himself. The court observed: "The practice of allowing the experts for the People and the defense to make examinations of the

prisoner, as to his mental condition, is the ordinary procedure in cases where the defense of insanity is interposed, and was resorted to in this case by defendant's counsel.''

Under such circumstances a witness may be sent to examine him while in jail as to his mental condition. [1 Greenleaf on Evidence (16 Ed.), sec. 469 e; People v. Glover, 71 Mich. 303.]

It is further insisted that error was committed in permitting the prosecuting attorney to testify to conversations with defendant with respect to his connection with the crime, over his objection. It appears from the record that the prosecuting attorney fully informed the defendant of his rights, and also notified him before he made any incriminating statments against himself that anything he said with respect to the homicide would be used against him at the trial, and that it was after this that the defendant confessed to the killing of both Mr. and Mrs. Yeater. There was no promise of immunity or hope held out to defendant in order to induce him to make the admissions, as in the case of State v. Hagan, 164 Mo. 654, but his statements to the prosecuting attorney were clearly voluntary. The fact that the defendant was under arrest, and in the presence of the officers, did not render the statements and admissions of defendant inadmissible. [State v. Jones, 171 Mo. 401; Underhill on Crim. Evidence, secs. 129-130; Wigmore on Evidence, sec. 851; 1 Elliott on Evidence, sec. 287.]

It is also insisted that the court erred in instructing the jury that drunkenness is no defense, because a comment on the evidence, in that it singles out that part of the alleged confession of the defendant without evidence upon which to base it. This instruction is not, we think, a comment upon the evidence, and is practically the same as the instructions passed upon and approved by this court in State v. West, 157 Mo. 309. The contention that there was no evidence that defendant

was drunk at the time of the commission of the homicide and therefore there was no evidence upon which to predicate the instruction in regard to drunkenness being no excuse for crime, seems to be justified by the facts disclosed by the record. The only evidence, if it can be called such, tending in the remotest degree, or from which it could here be inferred that the defendant was drunk at the time of the homicide, was that there was wine in the cellar and that after defendant had been to church and arrived at the house at about eleven o'clock on the night of the homicide, he went and drank a "lot" of blackberry wine, but he did not say how much, or what effect it had upon him. The killing occurred about one a. m. next morning, or shortly thereafter. It is true that a "lot" sometimes means a great deal, but as used by defendant in his confession the quantity, in the absence of evidence that it made the defendant drunk or was intoxicating, was entirely too indefinite and unsatisfactory to authorize an instruction of the character of the one under consideration. But it does not necessarily follow that the error was prejudicial. We do not think it was. At most the proposition was merely an abstract one, which should not operate as a reversal of the judgment under the circumstances of this case. If the defendant was not drunk how could he be prejudiced by instructing the jury that drunkenness is no excuse for crime, etc.? There is no contention that anything was an excuse for the crime in this case other than the insanity of the defendant, hence we are unable to conceive how he could have been prejudiced by this instruction.

The instructions given are free from substantial objection, except as we have indicated; in fact, are not challenged by the defendant, and all of them have been substantially approved by this court. [State v. Duestrow, 137 Mo. 44; State v. Palmer, 161 Mo. 152; State v. Holloway, 156 Mo. 222; State v. Melvin, 166 Mo. 565;

State v. Boyd, 178 Mo. 2; State v. Knowles, 185 Mo. 175.]

Another contention is that the court erred in not reprimanding counsel for the State when he referred to the defendant as a "culprit." Upon objection by counsel for defendant, the court said to the attorney then addressing the jury, "Be careful about the terms you apply to the accused." Thereupon the attorney corrected his statement by saying: "The accused, then, the accused upon trial," thus in effect withdrawing the objectionable remark.

In passing upon a similar question in the case of the State v. Fitzgerald, 130 Mo. 1. c. 436, it was said: "While it must be conceded that the remark was out of place, and should not have been made, yet when it was withdrawn by counsel who made it, it could not have been prejudicial to the rights of defendant, and the judgment should not be reversed upon that ground." A similar question was before this court again in the case of the State v. Hibler, 149 Mo. 1. c. 484, and it was said: "While counsel in their arguments before juries should confine them to the facts disclosed by the evidence, and never indulge in personal abuse of the defendant on trial in a criminal case, it is not every divergence from this course that will justify the reversal of the judgment. But in order to justify such a result it should appear to the court that the remarks complained of were prejudicial to defendant, and probably had something to do in bringing about the conclusion reached by the jury."

Our conclusion is, that under the circumstances, the remark complained of was not prejudicial to the defendant and that the judgment should not be reversed upon that ground.

It is also further insisted that the court erred in overruling defendant's motion for a new trial upon the ground of newly-discovered evidence. The affidavits on file in support of this contention tended to show the

early history of defendant, and the past and present condition of his mother, and her other children. This evidence would have been admissible on the trial as tending to show the defendant's mental condition at the time of the homicide, and that he was then insane. But there was a large amount of testimony introduced upon this branch of the case, and the newly-discovered evidence could have been nothing more than cumulative, and could not, we think, have produced a dieffrent result.

Among the things necessary for a defendant to show in order to entitle him to a new trial upon the ground of newly-discovered evidence, is that it is so material that it would probably produce a different result if the new trial were granted; and that it is not cumulative only. [State v. McLaughlin, 27 Mo. 112; State v. Ray, 53 Mo. 345; State v. Musick, 101 Mo. 260; State v. Welsor, 117 Mo. 570; State v. Nettles, 153 Mo. 468; State v. McCullough, 171 Mo. 571; State v. McKenzie, 177 Mo. 699.] It is plain from the affidavits filed in support of the motion, that they did not bring the case within the rule stated and so often announced by this court.

The only defense in this case was insanity. There could have been no other, because defendant in a written, as well as in a verbal, confession admitted the murder of his foster parents, and told all about its details, which shows it to have been unsurpassed in atrociousness by any crime ever committed in this commonwealth, and that, too, without any apparent motive therefor, and in excuse for the offense it devolved upon him to show to the reasonable satisfaction of the jury before whom he was tried and whose province it was to pass upon his innocence or guilt, under the evidence and instructions of the court, that he was insane at the time of the commission of the crime. This he failed to do. He had a fair trial, and finding no reversible er-

ror in the record we affirm the judgment, and direct that the sentence pronounced be executed.

All concur.